IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

| | | |
|---|---|---|
| THE BILL LUKOWSKI STEAMSHIP AGENCY, INC., *et al.*, | * | |
| | * | |
| Plaintiff/intervening plaintiffs, | | Civil Action No. |
| | * | 08-1077 CCB |
| v. | | |
| | * | |
| MIV SNOW BIRD, her engines, tackle and apparel, IMO No. 7726744, | * | |
| | | |
| Defendants *in rem/in personam.* | * | |

\* \* \* \* \* \* \* \* \* \* \*

### SUPPLEMENTARY MEMORANDUM SUPPORTING MERLIN PETROLEUM'S MOTION FOR INTERLOCUTORY SALE OF THE M/V SNOW BIRD

Pursuant to this Court's June 3, 2008 Order, intervening plaintiff Merlin Petroleum Company, Inc. supplements its original Motion and Supporting Memorandum for the Interlocutory Sale of the M/V SNOWBIRD ("Vessel").

This Court now should order the interlocutory United States Marshal's sale of the Vessel.

### Background

On April 29, 2008 - nearly a month and a half ago - the Bill Lukowski Steamship Agency ("Lukowski") arrested the Vessel, and it has been under arrest ever since. Merlin intervened on May 5th, and Gloucester Terminals intervened shortly afterwards. Vespucci Marine, the owner/claimant ("Owner"), has been unable to post security, of any type (not even, an insurer's letter of undertaking) for the Vessel's release. Vespucci - whose only operation appears to be, ownership of the Vessel - has shown no ability to pay the claims against the Vessel or to post

security, much less, any foreseeable prospect of paying the claims, or posting security for them, any time in the future.

Although Owner has been paying most post-arrest expenses, it has failed to pay about $50,000 of them (for wharfage), and there also is no assurance that Owner will be able interminably to pay vessel expenses (including crew wages, food, water, fuel) into the indefinite future, that it appears, but for a U.S. Marshal's sale, that the Vessel would be under arrest.

On May 28th, for example, Owner informed Lukowski, Merlin, and Gloucester that it was no longer able to pay the Vessel's expenses, necessitating emergency funding from the claimants to comply with U.S. Homeland Security regulations for guard service. Although Owner resumed payments on May 30, there is no assurance at all that Owner will not once again experience a "temporary cash shortage," necessitating additional emergency funding from claimants. This emergency funding - especially considering the relatively low value of the Vessel compared to all claims - as discussed below - could be very significant, very quickly. Daily guard service costs over $2,000; wharfage, $800-$1,000, and the crew must be paid regularly; claimants estimate that crew wages are at least, $10,000 per month. If crew are not paid, they could be entitled to double wages, as a penalty, under U.S. statutory maritime law.

The U.S. Coast Guard ("USCG") has determined that the Vessel is unfit to leave present, $1,000 per day berth. For more than six weeks, Owner has conducted repairs and had certificates updated in an effort to satisfy Coast Guard requirements; presently, the Vessel lacks a Chief Engineer and Second Mate, both required to move from the berth even to anchorage (and remain under arrest there). A range of required certificates for the Vessel, also have expired. Despite the time and expense invested, the Vessel has continuously failed Coast Guard inspections. There is no indication at this point in time that Owner will be able to bring the Vessel into compliance,

necessitating continued detention and accrual of significant daily expenses.

All post-arrest expenses, could be assessable as *custodia legis* expenses, which come in priority to those of the arresting parties.

To date, total maritime lien claims (of the arresting parties) against the Vessel are at least $390,000, including those of Lukowski (about $85,000), Merlin (about $241,000), and intervenor Gloucester Terminals LLC ("Gloucester") (about $63,000). In addition, there are outstanding charges of $51,600 due and owing - arguably, all post-arrest, *custodia legis* claims - to Canton Port Services LLC (dockage)(see, Exhibit A hereto). The approximately $4,500 that claimants Merlin and Gloucester had to advance when owner was "short" also are *custodia legis* claims, as is what is at least $1,500 or more of U.S. Marshal's insurance for the Vessel. Canton Terminals )(where the Vessel has been berthed, since its arrest over a month and a half ago) now has announced, that it no longer because of the need for space for its own commercial operations, will be able to have the Vessel past next Monday, June 16th, stay at its pier. Consequently, there will be a further, unknown amount to move the Vessel from Canton across the Baltimore Harbor to another berth (unknown at present), including the cost of tugs and line handling (about, $3,000), and further berthing costs (because, again the Coast Guard will not permit the Vessel to go to anchorage). If owner becomes unable to pay the Vessel's crew, claimants may be faced with the situation either of having to pay the crew, or, send them home (the crew are from Central America, Georgia (the country) and Greece) at a cost of $20,000 or more.

When one considers the total claims against the Vessel - both for maritime liens and *custodia legis* claims - which even before considering the high likelihood that owner will be unable to pay future claims - equal at least $445,000 - already, the claims (before considering accruing maritime prejudgment interest) are, after Vessel sale expenses (which typically are, about

-3-

10% of the gross proceeds, for advertising and brokerage), already in excess of the likely sale range of the Vessel.

Compass Maritime Services, LLC has estimated the value of the Vessel at $500,000 to $600,000 (Valuation Certificate, Exhibit B hereto). Given the total claims, outstanding charges, unknown moving and new dockage amounts, and the costs associated with the sale of a vessel, it is highly unlikely that selling the Vessel will produce enough revenue to satisfy all existing claims, and that in fact, the Vessel expenses and claims already have exceeded the likely Vessel sale price, at any U.S. Marshal's sale.

### An Interlocutory Sale is Justified Under Supplemental Rule E(9)

Pursuant to Supplemental Federal Admiralty and Maritime Rule E(9), this Court now should order an interlocutory sale of the Vessel because:

> A. the attached or arrested property is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action;
>
> B. the expense of keeping the property is excessive or disproportionate; or
>
> C. there is an unreasonable delay in securing release of the property.

Any one of these three factors is sufficient to order an interlocutory sale pursuant to Supplemental Rule E(9); here, all three are present. *Caterpillar v. Coleman*, 1999 U.S. Dist. LEXIS 22387, *2, 2000 AMC 539, 540 (C.D. Cal. 1999), *citing Merchants Nat'l Bank of Mobile v. Dredge General G.L. Gillespie*, 1982 AMC 1, 5, 663 F.2d 1338, 1341 (5th Cir. 1981); *see also Silver Star Enterprises, Inc. v. M/V Saramacca*, 19 F.3d 1008, 1014 (5th Cir. 1994).

The Vessel is liable to deterioration, decay, or injury by being detained in custody pending the outcome of this action. The valuation certificate provided by Compass Marine (Exhibit B) notes the Vessel's "past deficiencies," "ill trading and market reputation," and "extremely poor ...

condition." Exhibit C hereto, the Coast Guard's present Port State Control (basically, deficiency) record for the Vessel, bears out the Vessel's continued deficiencies. Owner has no real defense to any substantial part (if any at all) of any of the maritime lien claims against the Vessel. Owner claims that the ongoing repairs are "improving" the condition of the Vessel; if the five weeks of repairs and the resulting failed Coast Guard inspections are any indications, however, such repairs are merely postponing the inevitable sale of the Vessel. Although Owner might claim a fair market value of $3,000,000 ($2,000,000 if sold for scrap) based on "recent estimates," Owner has not, and Merlin expects, can not, provide any sworn affidavit or testimony in support of these figures, despite demanding the same proof from plaintiffs.

What should be kept in mind, too, is that this Court's scheduled hearing on Merlin's motion, is June 19th (8 days away); even if the Court were on June 19th to order the Vessel's sale, there would need to be (and the Local Rules would require) at least three (3) additional weeks, to advertise the Vessel for sale, and market that sale. Consequently, any U.S. Marshal's auction sale of the Vessel is at least a month away from the present date. If Owner miraculously, could post security, or pay the claims, then, in addition to the now over month and a half the owner has had to do that, since the arrest, Owner therefore would have an additional month to pay or post security, and the sale could be canceled and Vessel freed from arrest before any sale. There is, however, no reason to delay, now, setting a certain U.S. Marshal's Sale date, so that by that deadline, the Vessel either will sail, or, be sold.

### Sale of the Fuel Oil is Impractical and Unlikely to Satisfy Merlin's Claims

It also should be noted, that it is unlikely that any sale of the Merlin bunkers, aboard, the Vessel, will satisfy Merlin's claims.

First, Merlin's terms and conditions require that owners satisfy all of Merlin's expenses of

pursing Merlin's claims, including, attorneys fees and costs. Upon sale of the bunkers, their title passed to *in personam* defendant Didco. Although attorneys fees and court costs are not assessable *in rem* as maritime liens against the Vessel, they are assessable against Didco in personam and therefore against Didco's property. Merlin first will look to the bunkers to pay attorneys fees and costs.

In its letter to the Court of May 29, Owner claims that the fuel oil sold by Merlin (for which payment remains due and owing) has appreciated in value from $236,000 to $325,000 and that the sale of this fuel oil would generate sufficient revenue to satisfy Merlin's claim. However, as Owner is aware, the fuel oil provided by Merlin has been commingled with other fuel, raising issues of quality control that would very likely affect the going price if the fuel is sold. In addition, the fuel is "MGO" - a diesel fuel, not standard vessel bunkers - which is not sold in Baltimore; if it were off-loaded from the Vessel, after that off-loading, for sale, it would have to be barged, at significant cost, to Norfolk or back to New Jersey (where Merlin had hte fuel provided to the Vessel, in the first place). It also is uncertain, whether the Vessel's pumps would support any off-loading operations, what the insurance for off-loading would be, and whether the potential revenue merits the risk of environmental damage from a fuel spill. In sum, off-loading fuel from any vessel, much less the Vessel, is a very risky proposition, and, Merlin does not have to trade that for its certain maritime lien against the Vessel.

Furthermore, even if it were to accept an off-load of the bunkers for even partial satisfaction of its claims, the Lukoski, Gloucester, Canton Terminals, and likely, some part of the Merlin claims, would remain, with the Vessel without sufficient fuel to go to or remain at anchorage.

## Conclusion

In its current condition, the Vessel is worth no more than $600,000. Owner can provide no sufficiently supported basis to support any fair market valuation for more. Current claims on the Vessel approach $450,000 and do not include significant additional unknown costs that will, considering the costs of sale of the Vessel, more than likely exceed its $600,000 value. Owner's past non-performance – notably Owner's inability to bring the Vessel in compliance with Coast Guard requirements despite over five weeks of repairs – is strong evidence that this Court now should set a firm date for the United States Marshal's sale of the Vessel, before the Vessel suffers any further, additional erosion in value risking whether, claimants will be paid their full claims.

Dated: June 11, 2008.

/s/ J. Stephen Simms
J. Stephen Simms (#4269)
Simms Showers LLP
20 South Charles Street
Suite 702
Baltimore, Maryland 21201
Telephone: 410-783-5795
Facsimile: 410-510-1789

Merlin Petroleum Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on this June 11, 2008, I caused a copy of the foregoing to be filed on the Court's CM/ECF system for service on all record counsel.

/s/ J. Stephen Simms